NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 05a0465n.06
Filed: June 6, 2005

No. 03-4632

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

PROSPER NDABISHURIYE,                 )
                                        )
   *Plaintiff-Appellee*,                )
                                        )
v.                                   )   On Appeal from the United States
                                   )   District Court for the Southern
ALBERT SCHWEITZER SOCIETY, USA, INC.,   )   District of Ohio
AND HAROLD FETTER,              )
                                   )
   *Defendant-Appellant*.

Before:     BOGGS, Chief Judge; ROGERS, Circuit Judge; and SHADUR, District Judge.[*]

     **PER CURIAM.** Prosper Ndabishuriye must have thought it a stroke of good fortune when the Albert Schweitzer Society USA (the "Society") agreed to support his charity's project to build new homes for refugees displaced by Burundi's civil war. Since then he has been arrested many times, he has spent over five months in various Burundi prisons, his life has been repeatedly threatened, he has lost most of his personal possessions, he has accumulated debts of over $200,000, and his family has been forced to flee Burundi. His troubles started when Harold Fetter, Secretary-Treasurer of the Society, told Ndabishuriye to buy building supplies on his personal credit, assuring Ndabishuriye that the Society would reimburse him. Despite promising payment at least half a dozen times, Fetter eventually refused payment and told Ndabishuriye to get lost. In sworn

---

[*]The Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, sitting by designation.

testimony, Fetter stated that he never intended to pay the money, that he was aware of Ndabishuriye's plight, and that he hoped Ndabishuriye would "lose his number." Ndabishuriye kept the number, and he eventually filed suit to recover the promised funds and to compensate him for his suffering.

The defendants – Fetter and the Society – were no more forthcoming before the district court. They repeatedly failed to comply with discovery orders. For instance, in defiance of multiple court orders, the defendants refused to provide a copy of their litigation insurance policy, claiming that it was lost, and refused to disclose the Society's financial information. The district court first resorted to lesser sanctions and stern warnings. Finally, thirty days before trial was to commence, the district court entered default judgment against the defendants for failure to comply with discovery. For the reasons discussed below, we affirm.

**I**

Ndabishuriye is the president of Jeunesse en Reconstruction du Monde en Destruction, which translates to Youth in Reconstruction of the World in Destruction ("YRWD"). YRWD is an organization that builds homes for the poor and homeless in Burundi. Fetter is the Secretary-Treasurer of the Society and Dr. F. Arthur Bogaerts is the Chief Executive Officer of the Society. On October 7, 1998, Bogaerts, on behalf of the Society, entered into a written agreement whereby the Society agreed to form a cooperative association with YRWD. (JA 231-32). Under the terms of that agreement, the Society agreed to assist YRWD in its efforts to build homes for needy families in Burundi. According to the contract, the Society's assistance was to be in the form of providing building materials. In exchange, the Society would take the credit for any building projects and

utilize the good will that YRWD generated to promote the Society in its fund-raising campaigns.

In February 1999, Fetter contacted Ndabishuriye by telephone. During that conversation, Fetter asked Ndabishuriye to acquire building materials to be used in the construction of 700 new homes in Burundi using his (Ndabishuriye's) personal credit rather than having the Society send the materials. Fetter assured Ndabishuriye that the Society would promptly reimburse him for any expenditures he made for the building materials. In an August 26, 1999, letter that Fetter faxed to Ndabishuriye, Fetter promised on behalf of the Society to provide Ndabishuriye with an earth block machine (a device for making bricks) and to pay for the purchase of roofing materials. (JA 99). In reliance on Fetter's assurances, Ndabishuriye used his personal credit to purchase various building materials. YRWD began the construction on the 700-home project and eventually completed 253 of the 700 homes.

Over the next year, Fetter repeatedly promised Ndabishuriye that he would make payment. In a letter dated September 24, 1999, the Society, through Fetter, promised that "on or before October 8, 1999," it would make payment to YRWD's creditors for the cost of building materials totaling $67,420. (JA 233). On October 13, 1999, Doug Shoen, who was associated with the Elmbrook Church in Wisconsin, contacted Fetter on behalf of Ndabishuriye to inquire about the tardy funds. Fetter assured Shoen that the check was in the mail – that $67,420 had already been sent to Ndabishuriye's creditors. This was not true.

Fetter sent a letter to Ndabishuriye by fax on November 29, 1999, in which the Society added conditions to the payment of the $67,420, including the condition that it would be one-time payment settling all the Society's obligations and that no further payments would be made. (JA 102-03). The

letter stated that no payment would be made until Ndabishuriye agreed to the conditions. The letter also stated that the Society would have to reallocate the required funds in January or February since all of its funds for the current year had been expended and that it would contact Ndabishuriye by December 20, 1999, as to the date it would make payment. On February 21, 2000, Fetter faxed another letter to Ndabishuriye in which he stated:

> As we agreed, we will make payment to your suppliers directly in the gross amount due. We have not received any invoice for added interest on the balances due. Our total payment will be the $67,420 USD we agreed to pay as soon as we received funding at our bank, so we can send it. It is most unfortunate that you have lost personal property, maybe it will be returned when payment is finaly [sic] made . . . . We will not delay.

(JA 234).

No payment was ever sent. Instead, on March 7, 2000, Fetter revoked previous promises to pay any of the $67,420, or any other sum. He advised Ndabishuriye that the Society considered "our agreement with you . . . no longer in existence" and that, "[o]ur contract is cancelled, as of the date of November 1, 1998." (JA 106-08). In short, after promising payment for over a year, the defendants told Ndabishuriye to get lost.

Burundi's debt collection practices seem harsh by Western standards, and Ndabishuriye's inability to pay his debts had severe consequences for him and his family. For purposes of the 700-home building project, Ndabishuriye borrowed construction materials worth 70,230,520 Burundian Francs (BU) which converts to $160,344. Ndabishunye has been jailed on seven separate occasions in debtor's prisons. Ndabishuriye served two of those terms of imprisonment, which totaled over five months, in the Mpunba Central Prison in Burundi, where the conditions are atrocious. In addition to receiving threats on his life Ndabishuriye served the other terms of

imprisonment in police station prisons in Bujumbura. In addition to serving terms of imprisonment, Ndabishuriye was summoned to Burundian police stations over sixty times to answer for his failure to pay the debts. Because he could not repay more than a fraction of his debt,[1] Ndabishuriye has also lost most of his personal property. His creditors have repeatedly threatened his life and the lives of his family. Because of these threats, Ndabishuriye's family fled to Nairobi where they live in a slum.[2]

Fetter testified during his deposition that he had been lying to Ndabishuriye from the beginning, that he never intended to pay a cent, and that he repeatedly told him the money was on the way only to stall him. Fetter also testified that he knew that Ndabishuriye's life was being threatened and that Ndabishuriye was repeatedly imprisoned on account of his debts. Indeed, he specifically recalled an occasion when Ndabishuriye called him from jail. Fetter described Ndabishuriye's situation as "comical," and testified that he eventually asked Ndabishuriye to stop calling and to "lose his number."

Proceedings Below

Ndabishuriye filed a Complaint against Fetter and the Society on February 27, 2001. On July 20, 2001, Ndabishuriye filed his first Motion for Default, as no appearance by counsel had been entered on behalf of the Society a full five months after the filing of the Complaint. By Order of

---

[1]He has repaid 3,120,000 BU, or just over $7,000.

[2]The record does not indicate where Ndabishuriye himself presently resides. In his testimony on June 2004, he stated he was still living in Burundi attempting to continue his work and his family remained in Nairobi where his wife has difficulty procuring good work despite her skill as a nurse.

No. 03-4632
Albert Schweitzer Society USA, Inc. v. Ndabishuriye

September 9, 2001, and upon consent of the parties, Magistrate Judge Michael Merz was granted plenary magistrate judge jurisdiction. On November 5, 2001, the district court denied Ndabishuriye's first Motion for Default, as the Society had finally come forward.

On January 18, 2002, Mr. Ndabishuriye served, through counsel, a Notice of Deposition to Bogaerts, the President and CEO of the Society, noticing a deposition date of February 6, 2002. On January 25, 2002, more than five months late, defendants filed their Rule 26(a)(l) Initial Disclosures, announcing that Fetter and Ndabishuriye would be the only trial witnesses for defendants, and stating that Bogaerts's address was "unknown at [that] time."

On February 12, 2002, following many months of discovery disputes with defendants, Ndabishuriye filed his first Motion to Compel Discovery, which was unopposed and which was granted by the district court on March 15, 2002. On March 25, 2002, Ndabishuriye filed a Motion for Attorney's Fees and Expenses, asking the district court to impose sanctions on the defendants for their numerous discovery abuses. By Order of June 26, 2002, the district court directed the defendants to pay $850 in attorney's fees and expenses to Ndabishuriye due to the defendants' persistent failure to appropriately participate in discovery.

On April 1, 2002, defendants filed a Motion for Summary Judgment, which included an attached affidavit from Bogaerts dated August 24, 2001, and notarized by the Vice-Consul of the United States in Guatemala. On April 17, 2002, Ndabishuriye filed a Motion to Strike the affidavit on the grounds that Bogaerts had never been made available for deposition. The defendants claimed that Bogaerts was somewhere in Central America, that his whereabouts were otherwise unknown, and that Fetter had not spoken to him since conversing by phone in December 2001 and had no way

of contacting Bogaerts.[3]  Nonetheless, they contended, Bogaerts had gotten wind of this lawsuit and submitted a properly notarized affidavit before vanishing into the wilderness.  On April 22, 2002, Ndabishuriye filed a Memorandum in Opposition to the defendants' Motion for Summary Judgment.  On August 14, 2002, the district court granted Ndabishuriye's Motion to Strike and denied the defendants' Motion for Summary Judgment, noting that it would be fundamentally unfair to accept an affidavit from a person who suddenly emerged, signed an affidavit favoring the defendants, and then disappeared again before he could be cross-examined.

On October 11, 2002, Ndabishuriye filed his second Motion to Compel Discovery, which was granted by the district court on November 12, 2002.  On February 24, 2003, Ndabishuriye filed his second Motion for Default, based on the defendants' ongoing discovery abuses and refusal to comply with the prior orders and sanctions issued by the district court.  Defendants filed their Memorandum in Opposition to Ndabishuriye's Second Motion for Default on March 20, 2003.  Ndabishuriye's Second Motion for Default was granted on April 3, 2003.

A bench trial to determine damages was held on April 28, 2003.  On November 7, 2003, the district court held the defendants jointly and severally liable and awarded Ndabishuriye $277,471 in compensatory contract damages,[4] $100,000 in tort compensatory damages to account for the numerous jail sentences served and loss of property caused by the defendants' actions, and $100,000 in punitive damages, for a total award of $477,471.

---

[3]In their brief to this court, defendants again state that they have not spoken with Bogaerts since that December 2001 conversation, and they do not know if he is dead or alive.

[4]Compensatory damages are for $160,344 in original damages, plus interest of $117,127 through April 23, 2003.

This appeal followed. The defendants raise four claims before this court: (1) their summary judgment motion should have been granted; (2) default judgment was not appropriate; (3) damages were excessive; and (4) the affidavit from Bogaerts was improperly stricken from the record. We do not reach the fourth issue because our holding on the first three issues disposes of this case in its entirety.

## II

When a district court denies a motion for summary judgment because it determines that there exists a genuine issue of material fact, we review the denial only for an abuse of discretion. *Pinney Dock & Trans. Co. v. Penn Cent. Corp.*, 838 F.2d 1445, 1472 (6th Cir. 1988). Where, as here, there exists a genuine issue of material fact, summary judgment is not appropriate. Fed. R. Civ. P. 56(c).

The defendants argue that the contract with Ndabishuriye was entered into by Albert Schweitzer Society, International (ASSINT), not defendant Albert Schweitzer Society, USA (ASSUSA). Defendants also argue that Fetter is the Treasury-Secretary of ASSUSA, and hence is also not properly a defendant in this matter. The only evidence they offer in support of this argument is the affidavit of Bogaerts, which the district court struck. The affidavit from Bogaerts states that the two organizations are separate and that ASSUSA could therefore not be responsible for the contract.

Even assuming, *arguendo*, that the affidavit was improperly struck,[5] the record shows that

---

[5]We do not address whether the district court erred by striking the affidavit because we conclude that summary judgment for the defendants is clearly inappropriate even if the affidavit is considered.

a material issue of fact exists as to whether ASSUSA and ASSINT are really separate entities. The letters sent by Fetter were from ASSUSA, and Fetter is an officer of ASSUSA. The letters repeatedly refer to ASSUSA as a contracting party, and state that ASSUSA intends to fulfill its end of the bargain (at least until the final letter disavowed the contract). For instance, in the September 24, 1999, letter, Fetter writes that "*We* apologize for the delay in recognizing your agreement with *us* . . . . Although under Article 2 of *our agreemeent*, *we* are not liable for your financial obligations, under Article 7, *we* agreed to assist in providing materials . . . . [*W*]*e* are going to make payment . . . ." (JA 233) (emphasis added). This letter is typical; throughout his correspondence with the plaintiff Fetter assumes the authority to speak for the contracting party. In the final two letters – which, respectively, seek to modify the agreement and then to terminate the agreement – Fetter also represents himself as having the power to negotiate and alter the terms of the contract. The original contract lists Harold Fetter as the Secretary-Treasurer of the contracting organization and Fetter testified that ASSUSA is the only charitable organization of which he has ever been a member. Further clouding matters, the contract names as a party "The Albert Schweitzer Society USA (International) Inc.," not, as defendants argue, "The Albert Schweitzer Society International." Finally, other than the unsubstantiated affidavit of Bogaerts, defendants have not produced any evidence showing that ASSUSA and ASSINT are separate organizations. We therefore conclude that the district court properly denied the defendants' motion for summary judgment.

**III**

We review a decision granting default judgment for failure to participate in discovery for abuse of discretion. *Bass v. Jostens, Inc.,* 71 F.3d 237, 241 (6th Cir. 1995). We have laid out a four-

part test for determining whether an entry of default judgment is appropriate: 1) whether the party's failure to cooperate in discovery is due to wilful bad faith and not mere inability to cooperate, 2) whether the opposing party was prejudiced, 3) whether the offending party was warned that failure to cooperate could result in default judgment, and 4) whether less drastic sanctions were considered prior to an entry of default. *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990). In general, the first factor – bad faith – is the most important.

We conclude that the district court correctly applied the *Abbe* test and concluded that default was warranted. First, and most importantly, the evidence clearly supports the district court's finding that defendants engaged in a deliberate, bad faith strategy of delay and obfuscation. The defendants repeatedly delayed proceedings by missing deadlines, such as by failing to respond to the initial Complaint for more than five months.[6] They also stubbornly refused to comply with the court's discovery orders, despite an initial order to provide the plaintiff with his requested discovery, two additional Motions to Compel, and a sanction of $850 for plaintiff's attorneys' fees incurred to pursue the Motions to Compel.[7] For example, defendants were ordered to provide documents detailing the financial condition and organization of the Society. As of the second Motion for Default (after the deadlines for the initial discovery order and two Motions to Compel had all passed), the defendants had failed to provide even a single financial document. The defendants were also expressly ordered to provide information about the Society's insurance policy, which the

[6]The defendants delayed through petty means as well. For instance, in response to opening interrogatories they refused to name the Society's Board Members because they claimed that the interrogatory used the wrong acronym for the Society.

[7]The $850 remains unpaid to this day.

- 10 -

Society then claimed to have lost. It offered no explanation for why it was unable to secure an additional copy of the insurance policy. This explanation also contradicts Fetter's testimony that he had the insurance policy but would not turn it over, stating, "[y]our [sic] not entitled to it and we're not going to give it to you . . . . It is our personal business and I will not give it up without, believe me, a struggle, because it is none of your affair." (JA 123-25). In response to the request for the financial documents, Fetter stated "[t]here is no net worth, we don't have any money, and you're not entitled to it and we're not going to give it to you. Go get yourself whatever paperwork's necessary. You're not going to get it easily." (JA 125). He was certainly right about the last part; it has proved impossible for the plaintiff to get any financial information out of the Society and Fetter.

The defendants response is to assert (again) that the insurance information was lost and that they complied with the request for financial information when Fetter testified that the Society had no assets. The district court properly rejected these same justifications when they were offered below. First, the order was for documents detailing the Society's financial circumstances, not for an unsubstantiated, one-sentence description of the Society's lack of assets. Second, simply losing your copy of an insurance policy is not ordinarily a bar to producing it in discovery, since a phone call to the insurance company is generally all that is required to get another copy. Other than to assert that the insurance policy was misplaced, the defendants have not explained why it has been impossible to obtain another copy of the policy during the four years since the initial discovery order. There is ample evidence that defendants have delayed and obstructed discovery in bad faith.

Second, the district court correctly found that the failure to participate in discovery

prejudiced the plaintiff, thus satisfying the second part of the *Abbe* test. The second Motion for Default Judgment was filed only thirty days before trial. By that point, the plaintiff had already worked long hours before trial trying to obtain information that rightfully should have been produced almost a year earlier. Defendants' obstruction also made it very difficult for the plaintiff's counsel to prepare for trial. Absent information about the finances and organization of the Society, they were hampered in preparing their case on the merits and in pursing damages.

Third, the district court granted default only after making numerous other attempts to curb abuse and warning the defendants against continuing to obstruct discovery, thus satisfying the third and fourth part of the *Abbe* test. The district court had already granted two Motions to Compel, and imposed sanctions (attorneys' fees). In a previous order, it had specifically warned defendants against further noncompliance and the possibility of default as a remedy if obstruction continued. Repeated warnings, orders, and even sanctions had not altered the defendants stubborn unwillingness to comply with discovery. The district court properly concluded that the previous warnings and less drastic sanctions satisfied the third and fourth parts of the *Abbe* test.

## IV

"An award of damages by the trial court will not be overturned as excessive unless it manifests plain injustice, or is so grossly excessive as to be clearly erroneous." *Meyers v. City of Cincinnati*, 14 F.3d 1115, 1119 (6th Cir. 1994). The amount of compensatory damages is a question of fact, reviewed under the "clearly erroneous" standard. *Neyer v. United States*, 845 F.2d 641 (6th Cir. 1988). Under Ohio law, punitive damages are appropriate when a defendant either 1) acts with hatred, ill will, or malice, or 2) acts with conscious disregard for the rights and safety of another

person in a way that is likely to cause substantial harm. *Preston v. Murty*, 512 N.E.2d 1174, 1176 (Ohio 1987). We review the district court's application of the legal standard for punitive damages for clear error, and the district court's calculation of the amount of punitive damages for abuse of discretion. *Ellis v. Gallatin Steel Co.*, 390 F.3d 461, 470-71 (6th Cir. 2004).

The district court held the defendants jointly and severally liable and awarded Ndabishuriye a total of $477,471 in damages. The contract damages award included $160,344 of initial debt incurred, plus interest of $117,127 through April 23, 2003. The district court also awarded $100,000 in compensation for the tortious conduct of the defendants.[8] These damages were for the loss of freedom due to imprisonment, for mental and physical anguish, and loss of time with family. This finding is apparently based on the plaintiff's testimony as to the horrifying conditions of Burundian prisons and that, as of June 2004, he had spent only five weeks with his family since December 2000. Finally, the district court found that punitive damages were warranted under Ohio law due to Fetter's conscious disregard for the plaintiff's rights and safety and his repeated false assurances to the plaintiff that payment would be forthcoming. The district court awarded $100,000 in punitive damages. All of these findings were supported by evidence on the record and cannot be considered clearly erroneous.

The defendants mount a somewhat incoherent argument against this award of damages. Their central claim appears to be that the "testimony of the Appellees was incompetent; i.e. there

---

[8]The district court considered tort liability under several doctrines of Ohio law – fraud, intentional misprepresentation, and intentional infliction of emotional distress. Because liability was established by the default judgment, the district court did not specifically indicate which of these torts were found and proceeded directly to damages.

is absolutely no connection between Appellee's damages and the uncollected amount Appellants was [sic] supposed to send to Appellee." Appellants' Br. at 17. This is apparently an argument that there is no causal link between the wrongs of the defendants and the harms to the plaintiff. The defendants support this absurd assertion with the false claim that the plaintiff did not testify that he was in jail because of the debt; in fact the plaintiff testified at several points that he was jailed because of his debts. Otherwise, defendants do not identify any evidence that contradicts the findings of the court or casts doubt on the link between the defendants' wrongful acts and the harm to the plaintiff. The defendants fail to identify any aspect of the district court's determination of damages that was erroneous.

**V**

For the foregoing reasons, we **AFFIRM** the judgment of the district court.