COMMODITY FUTURES TRADING COMMISSION, Plaintiff-Appellee,

v.

AMERICAN COMMODITY GROUP CORP., et al., Defendants,

**Willa M. Ott, Appellant.**

No. 84–5026.
Non-Argument Calendar.

United States Court of Appeals, Eleventh Circuit.

Nov. 28, 1984.

---

Leonard Bloom, Boca Raton, Fla., Whitney Adams, Washington, D.C., John S. Freud, Miami, Fla., for plaintiff-appellee.

Before TJOFLAT, HILL and ANDERSON, Circuit Judges.

PER CURIAM:

## PROCEDURAL BACKGROUND AND FACTS

On February 25, 1982, the Commodity Futures Trading Commission ("CFTC"), an independent federal regulatory agency, sued various corporate and individual defendants ("defendants") for violations of the Commodities Exchange Act, as amended, 7 U.S.C.A. § 1 *et seq. Commodities Futures Trading Commission v. American Commodity Group Corp., et al.,* C.A. No. 82–6108 (S.D.Fla. filed Feb. 25, 1982). Defendants were in the business of selling futures contracts for the purchase of silver, gold, platinum, and copper in the form of bullion and coins. David L. Bentley, one of the individual defendants, is president of the corporate entities, and exercised effective control over their assets prior to the lawsuit. Another defendant, Universal Precious Metals, Inc. ("UPMI") was actually the entity which entered into the futures contracts with members of the public. On January 7, 1983, the district court in the *CFTC* action issued a "Final Order of Permanent Injunction." The order found by a preponderance of the evidence that the defendants had

> [b]y use of the mails and other means and instrumentalities of interstate commerce, directly or indirectly, ... employed devices, schemes or artifices to defaud clients or participants or prosepective clients or participants; and ... engaged in transactions, practices, and a course of business which operates as a fraud or deceit upon clients or participants or prospective clients or participants; and ... failed to deal fairly with clients or prospective clients in violation of § 4*o*(1) of the [Commodity Exchange] Act....

The district court enjoined the defendants from a wide range of activities, basically prohibiting them from participating in their commodities futures businesses in any way. In addition, they were prohibited from "dissipating, concealing or disposing of, in any manner, any assets, choses in action, or other property of [UPMI] wherever situated...." Finally, the district court appointed William Nortman ("Nortman") as equity receiver. Nortman's basic

responsibility was to try to recover, on behalf of the defrauded customers, monies which had been illegally taken by the defendants in the course of their business dealings.

Nortman was given two specific powers relevant here. He was "authorized and empowered to initiate such actions as may in his opinion be necessary and appropriate to recover from any person, corporation, partnership or other entity, any money, funds, credits or other assets of [UPMI] or any customer of [UPMI] which may have been converted, embezzled, misappropriated, or otherwise improperly transferred or dissipated...." Nortman was also ordered to make an accounting of "all assets and liabilities of [UPMI] together with all funds received and paid out, together with an accounting of all salaries, commissions, fees, loans, and commodity futures transactions in connection with the sale of the [UPMI] precious metals contract from May, 1981, to and including the date of such accounting...."

Nortman hired the accounting firm of Oppenheim, Appel, Dixon & Co. ("Oppenheim") to perform the accounting called for by the district court order. Oppenheim's report found that customers were owed an estimated $5.8 million. The report reveals a massive fraud perpetrated by the defendants upon their customers, the purpose of which was to siphon off monies paid by the contract purchasers to the individual defendants, particularly David Bentley, for their personal use.[1] The Oppenheim report also made the following statement:

> During our analysis of the above brokerage accounts, it came to our attention that $51,000 was apparently paid to Willa H. Ott, the wife of David Bentley, from the [UPMI] account of Midelton James & Co., Ltd.

Midelton James & Co., Ltd. ("Midelton James") is a commodities brokerage house with which UPMI had done extensive business. During its accounting investigation, Oppenheim requested information from Midelton James as to transfers from its UPMI account. Midelton James reported that on September 29, 1982 it had transferred $51,000 to the account of "WHO" at the Heritage Bank (in California). Oppenheim inferred that UPMI had transferred $51,000 to Willa Ott ("Ott"), the wife of defendant David Bentley.

In addition, Nortman had earlier become aware of another transaction involving UPMI and Ott. While investigating the disposition of funds belonging to UPMI, Nortman learned that a UPMI check in the sum of $24,409.28 had been drawn on UPMI's general operating account at the Sun Bank on December 14, 1981, and made payable to Landmark First National Bank. Nortman believed, because of documents he had received, that this check was used to repay a personal loan of Ott's which she had received from the Landmark First National Bank on or about November 16, 1981.

In November 1983, Nortman filed an ex parte application for an order to show cause directed to Willa H. Ott. The application requested that the court issue an order as to why Ott "should not be required to return the sum of $75,409.28 which she illegally and fraudulently converted, embezzled, misappropriated or otherwise improperly had transferred or dissipated from UPMI." Nortman also requested a show cause order why Ott should not be found in violation of the Florida civil theft statute, Fla.Stat.Ann. § 812.035(7) (West 1984), and therefore liable for treble damages and attorney's fees. In addition, Nortman filed an affidavit in support of the ex parte application for order to show cause which stated his belief that the $51,000 telex transfer from Midelton James and the check made payable to Landmark First National Bank were used by Ott for

---

1. Of course, we make no finding of fraud, a finding which has already been made by the district court in its "Final Order of Permanent Injunction." A finding of fraud is not directly relevant to the matters at issue here, but it illustrates the reasons for Nortman's actions discussed *infra*.

her own purposes or for those of her husband, David Bentley.[2]

On November 17, 1983, the district judge issued the order to show cause. The order required that Willa H. Ott show cause why she should not be required to return the aggregate sum of $75,409.28 to Nortman and why she should not be liable for treble damages as a result of her violation of the Florida civil theft statute. The court's order scheduled a hearing for December 20, 1983. The record indicates that Ott was served with the order to show cause, Nortman's application for an order to show cause, and Nortman's affidavit in support thereof on November 26, 1983.

Between the date of service and the hearing date, a 24-day period, Ott did not answer Nortman's application for the order to show cause,[3] nor did she initiate any discovery or request a continuance.

Ott did not appear at the show cause hearing on December 20, nor was an attorney there to represent her. At the hearing, however, a Mr. Field, who was present in the courtroom pursuing other matters related to the *CFTC* action, told the court that while he "had not been engaged to represent [Ott, he did not] want [the show cause order] to go by default." He declared that Ott's full name is Willa Mary Ott, not Willa H. Ott, as the "WHO" designation in the Midelton James letter would indicate. He claimed that Willa M. Ott was not the "WHO" who received the $51,000 transfer from Midelton James to the Heritage Bank.[4]

Apparently rejecting Field's protestations, the judge then stated that "[i]t is going to go by default and I'm going to enter an order against Willa H. Ott...."

Field then repeated, without adverting to specific evidence, that Ott was unconnected to the Midelton James transfer. At this point, the attorney for Nortman recited the evidence against Ott as incorporated in the show cause application and its supporting affidavit. The judge then indicated that he would rule in favor of Nortman, and requested Nortman's attorney to draft an order. On January 10, 1984, the judge issued an "Order and Judgment" granting Nortman a recovery of the full amount requested, $75,409.28, and treble damages under the Florida civil theft statute in the amount of $226,227.84.

## DISCUSSION

■ On appeal, Ott primarily attacks the judgment below on three grounds: (1) that the default judgment is invalid since service of process was made on Willa M. Ott, not someone with the initials "WHO"; (2) that her due process rights were denied in that she had no opportunity to engage in discovery; and (3) that the granting of treble damages under Fla.Stat.Ann. § 812.-035(7) was improper in this case because it amounted to a finding equivalent to a criminal conviction.

In our view, the errors asserted by Ott are not cognizable in this court by virtue of the fact that the district court rendered its decision by default. *See* Fed.R.Civ.P. 55. Nortman's application for an order to show cause was the functional equivalent of a complaint. Likewise, Ott's position in district court was of "a party against whom a judgment or affirmative relief is sought [and who] has failed to plead or otherwise defend...." Fed.R.Civ.P. 55(a).[5] Thus,

---

2. Nortman's affidavit was accompanied by supporting documentation, including a letter from Oppenheim regarding the $51,000 transfer to "WHO," and a loan agreement, cancelled check, and bank ledger with regard to the $24,409.28 payment from UPMI to Landmark First National Bank.

3. *Cf.* Fed.R.Civ.P. 12(a) ("A defendant shall serve his answer within 20 days after the service of the summons and complaint upon ...").

4. Field made no mention of the $24,409.28 transfer used to repay the loan at Landmark First National Bank.

5. There is little dispute as to whether the district court's judgment was one of "default." The court characterized it as such during the show cause hearing and Ott repeatedly does so in her appellate briefs. We believe that Field's conduct during the show cause hearing does not amount to a "defense" on behalf of Ott. *See* Fed.R.Civ.P. 55. Field was not engaged to represent Ott at the hearing. Even if we assume

the strictures of Rule 55 apply and the court was empowered to enter its judgment. *See* Fed.R.Civ.P. 55(b)(2).

■■■ This court will not review the underlying merits of a dispute upon which a default has been entered, in accordance with our longstanding policy of not reviewing issues not raised below, unless, of course, the defaulting party is challenging the district court's subject matter jurisdiction.[6]

■ As Nortman accurately points out, Ott had several opportunities to challenge Nortman's claims at the district court level. She could have appeared and offered evidence at the December 20 hearing. Thereafter, she could have moved that the entry of default be set aside "[f]or good cause shown" pursuant to Fed.R.Civ.P. 55(c). Twenty-one days elapsed between the show cause hearing and the Order and Judgment of January 10, 1984, indicating that a Rule 55(c) motion was certainly a viable option. In addition, Ott could have challenged the default even after the district court's entry of judgment by moving pursuant to Fed.R. Civ.P. 60(b) ("Relief from Judgment or Order") or Fed.R.Civ.P. 59 ("New Trials;

Amendment of Judgment"). Significantly, the civil rule pertaining to defaults specifically states that "if a judgment by default has been entered, [it] may likewise [be] set aside in accordance with Rule 60(b)." Fed. R.Civ.P. 55(c).

If Ott had used one of these procedural mechanisms, she would have had the opportunity, for instance, to present evidence contradicting Nortman's affidavit or to argue that treble damages under Fla.Stat. Ann. § 812.035(7) were impermissible in her case. She might have simply argued that her failure to appear at the show cause hearing was "excusable neglect." *See* Fed.R.Civ.P. 60(b)(1). Moreover, if the district court had denied her motions under any of the above mentioned rules, this court could have reviewed such denial on an abuse of discretion standard. 10 M. Kane, A. Miller, C. Wright, *Federal Practice & Procedure* § 2693 & n. 2 (2d ed. 1983).

However, Ott did *not* use any of the procedural mechanisms which permit relief from an improper or unjust default judgment.[7] That being the case, and since the

---

that Field was acting as Ott's lawyer, we would still be justified in finding that the district court's judgment was one of default. Field, as indicated above, made only conclusory denials of the claims asserted against Ott. Field did not produce any evidence, nor did he request an evidentiary hearing or a continuance. Thus, even if Ott could be said to have acted through Field at the show cause hearing, the district court properly held that she had "failed to plead or otherwise defend...." Fed.R.Civ.P. 55(a).

6. Ott makes one argument which implicitly challenges the district court's jurisdiction. She argues that Nortman was required to file a separate civil action under Fed.R.Civ.P. 3, and that Nortman's ancillary action brought by virtue of his power as receiver is invalid and of no effect. This argument is without merit. The case law indicates that the decision to appoint an equity receiver in enforcement actions under the Commodities Exchange Act is a matter within the sound discretion of the trial judge. *See, e.g., Commodity Futures Trading Commission v. Morgan Harris & Scott, Ltd., et al.,* 484 F.Supp. 669 (S.D.N.Y.1979). Receivers have the power to bring ancillary actions similar to the action brought by Nortman against Ott. *See Commodity Futures Trading Commission v. Chilcott Portfolio Mgmt., Inc., et al.,* 713 F.2d 1477 (10th

Cir.1983); *Commodity Futures Trading Commission v. Morgan Harris & Scott, Ltd., et al., supra.*

Moreover, it is difficult to see how Ott was prejudiced in this regard. As indicated in the text, *supra,* Nortman's application for an order to show cause was the functional equivalent of a civil complaint. She was duly served with the application and had more than adequate time to answer, *see supra* note 3, request a continuance, or pursue discovery. In fact, although we need not reach the issue, Ott's claim that she was denied due process because she had insufficient time to pursue discovery is similarly baseless. She had 24 days in which to pursue discovery or request a continuance to enable her to make full use of the discovery tools prior to the show cause hearing, but she failed to do so.

7. Ott claims that her failure to make use of Rules 55(c) and 60(b) is justified because she "is not required to engage in a useless activity." However, the record does not indicate that such motions would have been "useless." Moreover, as indicated in the text, *supra,* if Ott had presented substantive arguments to the district court in an attempt to amend or reopen the judgment, we would have been empowered to decide whether the district court had abused its discretion.

district court had jurisdiction,[8] we will not exercise review based upon arguments not raised below. Accordingly, the district court's judgment is

AFFIRMED.