RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0153p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

PRIME RATE PREMIUM FINANCE CORPORATION, INC.,
                              *Plaintiff-Appellee*,

*v.*

KAREN E. LARSON, Individually and as Personal
Representative of the Estate of Keith A. Larson,
                              *Defendant-Appellant*.

No. 18-2071

———————————

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 2:14-cv-12397—David M. Lawson, District Judge.

Decided and Filed:  July 11, 2019

Before:  McKEAGUE, THAPAR, and MURPHY, Circuit Judges.

———————————

## COUNSEL

**ON BRIEF:**  Eric A. Parzianello, HUBBARD SNITCHLER & PARZIANELLO, PLC,
Plymouth, Michigan, for Appellant.  Debra Beth Pevos, JACOB & WEINGARTEN, P.C.,
Southfield, Michigan, for Appellee.

———————————

## OPINION

———————————

MURPHY, Circuit Judge.  After four years of perpetual delays, Prime Rate Premium
Finance Corporation obtained a sixth trial date to vindicate its claims that Karen Larson and her
late husband, Keith Larson, had bamboozled it out of hundreds of thousands of dollars.  Yet the
day before trial, after red-flag warnings that the district court would entertain no further
extensions, Larson moved for a continuance.  Her last-minute motion came with an unsigned

doctor's note, the letterhead of which did not match its signature block.  Larson did not show up for trial the next day.  The district court found that her motion fell "within a pattern of delaying tactics," including exaggerated medical excuses, disputes with her attorneys, and abuse of the bankruptcy process.  Having had enough, the court denied Larson's motion, struck her answer, granted Prime Rate a default judgment, and awarded it $964,530.48.  Larson now argues that the district court's orders denying a continuance and entering a default judgment abused the court's discretion and violated her due-process rights.  We think not and affirm.

I.

Prime Rate Premium Financing Corporation loans money to businesses to pay their insurance premiums.  Karen Larson and her late husband, Keith Larson, ran an insurance agency, Larson's Insurance Solutions Agency.  In 2013, the Larsons' insurance agency sent Prime Rate fourteen agreements to obtain premium financing for several businesses, ranging from a tree-trimming company to a pizza restaurant.  Under each agreement, Prime Rate agreed to pay the Larsons' agency the total premiums that the insured business owed its insurance company under its year-long policy; the agency agreed to pass along the funds to the insurance company; the insured business agreed to repay Prime Rate in monthly installments.  But Prime Rate soon learned that the agreements were fraudulent.  The insured businesses refused to pay Prime Rate for several reasons.  Among them: the Larsons' agency had forged the insureds' names or had not forwarded the loaned funds to the insurance company.  An agency employee accused Karen Larson of orchestrating this fraud.  Prime Rate was left holding the bag to the tune of $321,510.16.

A Michigan regulator caught wind of the Larsons' misdeeds.  Its investigation revealed that they submitted forged applications "to obtain money for [their] personal and business use." It canceled their insurance licenses.

Uncovering the fraud was the easy part.  Recovering the money has been another matter. In June 2014, Prime Rate invoked the district court's diversity jurisdiction to recoup its funds from the Larsons under several state-law theories.  (Keith Larson died after Prime Rate sued, and

Karen now represents his estate.)  A half-decade odyssey resulted.  This litigation history puts the default judgment in its proper light.

*June 2014 to May 2018*.  Before Prime Rate could serve the Larsons, they filed for bankruptcy, which stayed this case.  By December 2014, the bankruptcy court had dismissed that matter because the Larsons failed to follow the rules.

Prime Rate next encountered service-of-process headaches.  After several failed efforts, a process server served Mr. Larson at their home, but he said his wife was too ill to come to the door.  A later service attempt failed because Ms. Larson "didn't feel like coming downstairs."  The clerk entered a default against the Larsons, but they disputed their service.  In April 2015, the court held that service on Mr. Larson sufficed to serve them both.  It set aside the default, but ordered the Larsons to pay $2,000.

Then came delays caused by Ms. Larson's struggles with her attorneys.  In June 2015, the Larsons' first attorney withdrew.  Two others appeared.  By January 2016, those attorneys moved to withdraw because, according to them, Larson falsely accused them of wrongdoing, including sexual assault.  The Larsons received time to find new counsel.  Two new lawyers appeared in June 2016.  By March 2017, they too moved to withdraw.  They asserted that Larson accused them of misconduct and that she used falsified evidence.  The court again stayed the case to allow the Larsons to find other lawyers.  From then on, the Larsons proceeded pro se.

Up next: more bankruptcy filings.  In June 2017, the Larsons filed a bankruptcy petition that delayed the case for months.  That matter was again dismissed.  Undeterred, after her husband died, Larson filed a third petition in March 2018, which stayed this case for 30 days. *See* 11 U.S.C. § 362(c)(3)(A).

Five trial dates came and went over these years.  Apart from the delays described above, other legitimate delays arose from Mr. Larson's death and from a car accident involving the Larsons' son.

*May to August 2018*.   In May 2018, the court warned Larson that it would grant "[n]o further continuances" of an August 14 trial date.  Its final pretrial order told the parties to provide their trial documents by August 1.

On August 1, instead of trial documents, Larson sent an ex parte email captioned "Karen Larson Fractured Ribs, Concussion, Neck Injury."   The email had two attachments.  A letter dictated by Larson stated that she had fallen while in a state courthouse, that she was "far too injured to do anything," and that the case must be "dismissed immediately."   An "excuse slip" from "Mathews Medical Center" noted that Larson was "unable to return to work at this time because of broken ribs and a concussion."

In an August 6 order, the court noted that Larson had disobeyed its pretrial order by not cooperating with Prime Rate in trial prep.  Her actions, the court warned, were grounds for sanctions, including a default judgment, under Federal Rules of Civil Procedure 16(f) and 37(b)(2).  "Absent a proper motion supported by reliable documentation," the court continued, it would "proceed with trial."   It ended by again warning that "failure . . . to abide by the Court's orders, submit required documentation, or appear in court as directed, will be met with the imposition of sanctions, including a default judgment."

On August 13—the day before trial—Larson moved for a continuance.  She included an unsigned letter purportedly from Dr. Mazin Yonan.  The letterhead referenced "MATHEW'S MEDICAL CENTER" (with an apostrophe); the signature block spoke of "Mathews Medical Center" (without one).  The body stated that the prior excuse slip "denoted the extent of [Larson's] injuries" and warned that "seeking further medical information may actually violated [sic] her HIPPA [sic] rights."   It opined that "Karen's injury status has not changed and under no circumstances would she be able to participate in any hearings."   And it asserted that "this injury was witnessed by numerous members of the Oakland County sheriff's department who were present at the occurrence of the aforementioned fall, and within close proximity, after which, a formal report was filed."

The next day, Larson did not appear.  The court denied her motion for a continuance, struck her answer, and entered a default.  Fed. R. Civ. P. 55(a).  It expressed doubt about the

letter's authenticity.  It also summarized the history of delays, the failure to cooperate in trial prep, the prejudice to Prime Rate, and the prior sanctions.  Prime Rate moved for a default judgment and put on two witnesses.  Fed. R. Civ. P. 55(b)(2).  The court granted the motion and trebled the damages under a state-law claim.  It memorialized these oral rulings in a later order, and entered a judgment for $964,530.48.

## II.

We begin with an issue critical to a court's power to coerce one person to pay another: its subject-matter jurisdiction.  The parties agree that diversity jurisdiction exists because they are "citizens of different States."  28 U.S.C. § 1332(a)(1).  Yet a circuit court must ensure that the district court had jurisdiction "even though the parties are prepared to concede it."  *Delay v. Rosenthal Collins Grp., LLC*, 585 F.3d 1003, 1004 (6th Cir. 2009) (citation omitted).  For some 200 years it has been the rule that—no matter the time and resources spent—an appellate court must wipe out everything that has occurred if the lower court lacked jurisdiction.  *See Grupo Dataflux v. Atlas Global Grp., L.P.*, 541 U.S. 567, 571 (2004) (citing *Capron v. Van Noorden*, 6 U.S. 126 (1804)).  It thus behooves parties to be meticulous in jurisdictional matters.

Prime Rate was not meticulous.  To begin with, its complaint alleged that the Larsons were Michigan "resident[s]."  But "it has long been settled that residence and citizenship [are] wholly different things."  *Steigleder v. McQuesten*, 198 U.S. 141, 143 (1905).  "[A] mere averment of residence" does not aver citizenship, *id.*, so "[w]hen the parties allege residence but not citizenship, the court must dismiss the suit," *Guar. Nat'l Title Co. v. J.E.G. Assocs.*, 101 F.3d 57, 59 (7th Cir. 1996).  Citizenship instead turns on "domicile."  *Von Dunser v. Aronoff*, 915 F.2d 1071, 1072 (6th Cir. 1990).  "Domicile," a legal term of art, requires that a person *both* be present in a state *and* have "the intention to make his home there indefinitely or the absence of an intention to make his home elsewhere."  *Stifel v. Hopkins*, 477 F.2d 1116, 1120 (6th Cir. 1973).

In addition, Prime Rate's complaint alleged only that it was "a South Carolina corporation."  Yet a corporation is a citizen of the state in which "it has been incorporated" and of the state in which "it has its principal place of business."  28 U.S.C. § 1332(c)(1).  So a complaint "'must allege both the corporation's state of incorporation and its principal place of

business.'" *McGhee v. Hybrid Logistics, Inc.*, 599 F. App'x 259, 259 (6th Cir. 2015) (per curiam) (citation omitted).

Do these defective allegations compel us to upend five years of litigation? Thankfully, parties may cure "[d]efective allegations of jurisdiction" on appeal. 28 U.S.C. § 1653. That statute allows parties to fix "incorrect statements about jurisdiction that actually exists, [but] not defects in the jurisdictional facts themselves." *Newman-Green, Inc. v. Alfonzo-Larrain*, 490 U.S. 826, 831 (1989). Because the statute seems tailormade for the apparently technical pleading errors in this case, we ordered the parties to file supplemental briefs on jurisdiction.

The parties' supplemental briefs (barely) establish jurisdiction. Prime Rate says it is a "South Carolina corporation." We take that statement to mean, as public records show, that Prime Rate was incorporated in the state (although, going forward, parties should expressly note their state of incorporation). *See Reece v. Howmet Corp.*, 639 F. App'x 245, 245 n.1 (5th Cir. 2016) (per curiam); Fed. R. Evid. 201(c)(1); S.C. Sec'y of State, Business Entities Online, https://businessfilings.sc.gov/BusinessFiling/Entity/Search. An officer also says that Prime Rate keeps its headquarters in Florence, South Carolina, which proves its principal place of business. *Hertz Corp. v. Friend*, 559 U.S. 77, 92–93 (2010). Prime Rate thus is a South Carolina citizen.

On to the defendants. While our briefing order explained that citizenship turns on domicile rather than residency, Prime Rate states that it adequately alleged diversity jurisdiction because the Larsons are Michigan "residents." *Cf. Guar. Nat'l Title*, 101 F.3d at 59. Fortunately for Prime Rate, Larson concedes that she was "domiciled" in Michigan (which includes her intent to remain). She also "has no basis to otherwise contest" jurisdiction, which shows her late husband was domiciled there too. *See* 28 U.S.C. § 1332(c)(2). Indeed, "corroborating evidence" confirms their domicile, such as the fact that the two lived together at an address in Livonia, Michigan, and operated a Michigan company. *See Naji v. Lincoln*, 665 F. App'x 397, 400 (6th Cir. 2016). That leaves one loose end: Prime Rate's first amended complaint sued the Larsons' son. His citizenship does not matter now because the parties agreed to his stipulated dismissal. *See Grupo Dataflux*, 541 U.S. at 572–73. The parties are diverse.

III.

On the merits, Larson (now through counsel) argues that the district court (1) wrongly denied a continuance, (2) wrongly entered a default judgment, and (3) violated due process.

1. *Continuance*.    The Federal Rules of Civil Procedure give district courts broad flexibility in trial scheduling.  Rule 40 simply says that each court "must provide by rule for scheduling trials" (while giving preference to trials that statutes prioritize).  Fed. R. Civ. P. 40. Rule 16 adds that a court may include a trial date in the required scheduling order.  Fed. R. Civ. P. 16(b)(3)(B)(vi).

It is hard to imagine an area in which an appellate court should give a trial court more leeway than in scheduling civil trials and considering continuance motions.  *See* 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2352, at 383–85 (3d ed. 2008). Indeed, on one of the first occasions that the Supreme Court faced a challenge to a lower court's refusal "to continue a case," it said categorically that the refusal "cannot be assigned as error." *Earnshaw v. United States*, 146 U.S. 60, 68 (1892) (discussing *Woods & Bemis v. Young*, 8 U.S. 237, 238 (1808)).  Nowadays, "[t]he granting or denial of a continuance is a matter within the discretion of the trial judge and will not be reversed on appeal unless there has been a clear abuse of discretion."  *Scholl v. Felmont Oil Corp.*, 327 F.2d 697, 700 (6th Cir. 1964); *Perkins v. Am. Elec. Power Fuel Supply, Inc.*, 246 F.3d 593, 604 (6th Cir. 2001).  And, when reviewing such a decision, appellate courts avoid "mechanical tests" in favor of a totality-of-the-circumstances review.  *United States v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th Cir. 1969) (per curiam) (citation omitted); 9 Wright & Miller, *supra*, § 2352, at 401–02.  (Even proponents of a rules-based approach to law concede the occasional necessity of that review.  Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L. Rev. 1175, 1186–87 (1989).)

Here, the district court's denial of a continuance fell firmly within its scheduling discretion.  Start with the big picture.  The court bent over backwards to accept delays caused by Ms. Larson during this litigation.  It had already been forced to grant adjournments because the Larsons filed half-hearted bankruptcy petitions (which were dismissed for failure to follow the rules) and burned through attorney after attorney.  And recall the delay in even starting the case

because, among other things, Larson "didn't feel like coming downstairs" to accept service.  The court's denial of a continuance properly accounted for her "egregious pattern of dilatory tactics." *Arabian Am. Oil Co. v. Scarfone*, 939 F.2d 1472, 1479 (11th Cir. 1991); 9 Wright & Miller, *supra*, § 2352, at 399 & n.10.

The district court also rightly factored in the prejudice that a continuance would cause Prime Rate.  *See Smith v. Argent Mortg. Co.*, 331 F. App'x 549, 555–56 (10th Cir. 2009).  As a general matter, Larson's conduct had already forced the company to wait over four years to prove that Larson perpetuated a bold-faced $300,000 fraud.  As a specific matter, a Prime Rate witness had already flown in from South Carolina to testify at the Michigan trial.

Timing matters, too.  "Where a trial date has been set for some time and a continuance is requested shortly before trial, the court may deny the continuance."  *Heller Fin., Inc. v. Pandhi*, No. 88-6020, 1989 WL 136091, at *3 (6th Cir. Nov. 9, 1989) (per curiam).  If anything, Rule 16 *limits* the district court's authority to grant a continuance so close to a trial date.  After a final pretrial conference, a court may modify the final pretrial order (which would include the proposed trial date) "only to prevent manifest injustice."  Fed. R. Civ. P. 16(e).  And here, even though the district court entered an order on August 6 informing Larson of the need to file a motion for a continuance, she waited until August 13—the very last day before trial—to do so.

To be sure, Larson claimed to have suffered a recent injury—a factor that could justify a continuance "in those circumstances that seem persuasive to the trial judge."  9 Wright & Miller, *supra,* § 2352, at 400–01.  But the district court here could find this excuse unpersuasive.  *Cf. Moffitt v. Ill. State Bd. of Educ.*, 236 F.3d 868, 875 (7th Cir. 2001).  As it explained, Larson submitted a questionable doctor's letter.  The clinic's seemingly oft-used letterhead had an errant apostrophe.  The letter also goes beyond describing Larson's condition and its effect on her ability to attend trial.  It chides the court about Larson's "HIPPA rights [sic]" (strange, given Larson's request for disclosure) and offers details about the accident (stranger, given that these facts would fall outside the doctor's personal knowledge).  Perhaps the letter was genuine.  But the district court had good reason to deny Larson the benefit of the doubt given all that had preceded it.

Larson's responses do not change things.  Her arguments mostly attack the district court's concerns with her doctor's letter, closely examining the letter and criticizing the court's failure to hold an evidentiary hearing on it.  Consider us unmoved.  Even if the letter were valid, the district court could deny a continuance based on this case's history alone.  Tellingly, Larson says little about her prior conduct.  Further, holding a hearing over whether to grant a continuance would effectively *grant* a continuance given her request's last-minute nature.

Larson also falls back on her pro se status.  Yet, even if courts should sometimes "apply 'less stringent standards'" for pro se litigants, that "lenient treatment . . . has limits," especially when dealing with "easily understood" instructions.  *Pilgrim v. Littlefield*, 92 F.3d 413, 416 (6th Cir. 1996) (citation omitted).  "No further continuances" is easily understood.

After four years and six trial dates, the district court could not be accused of a "myopic insistence" on speed.  *Ungar v. Sarafite*, 376 U.S. 575, 589 (1964).  We see no abuse of discretion.

2. *Default Judgment*.  District courts have tools "to penalize" those who violate their rules.  *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976) (per curiam).  Rule 16(f) authorizes courts to issue "just orders," including the sanctions listed in Rule 37(b), for failure to follow a scheduling or other pretrial order.  Fed. R. Civ. P. 16(f)(1)(C).  These sanctions "may include" "rendering a default judgment."  Fed. R. Civ. P. 37(b)(2)(A)(vi).  Here, the court granted a default and then a default judgment because of Larson's "failure to appear at trial[] and her refusal to cooperate" in trial preparation.  *See* Fed. R. Civ. P. 55(a)–(b).

Before reviewing that decision, we must ask if we even have the authority to do so.  "There is a circuit split" over whether a party may appeal from a default judgment under Rule 55(b)(2) (as Larson did) without first moving to vacate the judgment under Rule 60(b) (as Rule 55(c) allows).  *BHTT Entm't, Inc. v. Brickhouse Café & Lounge, LLC*, 858 F.3d 310, 314 & n.7 (5th Cir. 2017).  Some courts decline to review appeals from a default judgment, holding that an appellant fails to preserve arguments for overturning a judgment without a Rule 60(b) motion.  *Consorzio Del Prosciutto Di Parma v. Domain Name Clearing Co.*, 346 F.3d 1193, 1195 (9th Cir. 2003); *Commodity Futures Trading Comm'n v. Am. Commodity Grp. Corp.*, 753 F.2d 862,

866–67 (11th Cir. 1984) (per curiam).  Others consider appeals directly from default judgments. *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 127–29 (2d Cir. 2011).  As for our court, it has refused to review a challenge to a default judgment without a Rule 60(b) motion, *Nationwide Life Ins. Co. v. Penn-Mont Benefit Servs., Inc.*, No. 16-4707, 2018 WL 1124133, at *5 (6th Cir. Jan. 31, 2018), but has also directly reviewed those judgments, *Grange Mut. Cas. Co. v. Mack*, 270 F. App'x 372, 376 (6th Cir. 2008) (per curiam).  For our part, we do not see anything in the Federal Rules that requires a party always to file a Rule 60(b) motion in order to appeal a default judgment, and our court has not required a party to file such a motion before similarly appealing the dismissal of a complaint, *Carter v. City of Memphis*, 636 F.2d 159, 161 (6th Cir. 1980) (per curiam).

In this case, though, we need decide one (and only one) thing: that any mandate to file a Rule 60(b) motion is not jurisdictional.  A federal statute, 28 U.S.C. § 1291, gives us jurisdiction over "final decisions" of the district courts.  As with any final judgment, "a judgment entered pursuant to Rule 55(b)(2) may be reviewed immediately by the court of appeals."  10A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2684, at 28 (4th ed. 2016).  Any Rule 60(b) exhaustion mandate—which would not flow out of any federal statute—instead would count as a non-jurisdictional "claims-processing" rule.  *See Hamer v. Neighborhood Hous. Servs. of Chi.*, 138 S. Ct. 13, 17–18 (2017).  Parties may forfeit reliance on those types of rules by not timely raising them.  *Id.*  Here, Prime Rate did not raise (and so has forfeited) this argument.  We leave for another day whether a Rule 60(b) requirement actually exists.

The prelude over, we turn to the main event.  We review sanction decisions, including those involving a default judgment, for an abuse of discretion.  *Bank One of Cleveland, N.A. v. Abbe*, 916 F.2d 1067, 1073 (6th Cir. 1990).  Yet "[d]iscretion is not whim, and limiting discretion according to legal standards helps promote the basic principle of justice that like cases should be decided alike."  *Martin v. Franklin Capital Corp.*, 546 U.S. 132, 139 (2005).  Put differently, "a motion to [a court's] discretion is a motion, not to its inclination, but to its judgment; and its judgment is to be guided by sound legal principles."  *Id.* (quoting *United States v. Burr*, 25 F. Cas. 30, 35 (No. 14,692d) (C.C.D. Va. 1807) (Marshall, C.J.)).  Courts develop those principles by examining the text and context in which the discretion has been delegated

along with prior cases applying the discretion.  *See Halo Elecs., Inc. v. Pulse Elecs., Inc.*, 136 S. Ct. 1923, 1932 (2016).

Following this path, we have established several legal principles that guide a discretionary decision to grant a default judgment (against a defendant) or a dismissal (against a plaintiff) under Rule 37.  From a bird's-eye view, we have noted that this sanction "is a drastic step which should be resorted to only in the most extreme cases."  *United Coin Meter Co. v. Seaboard Coastline R.R.*, 705 F.2d 839, 845 (6th Cir. 1983).  More in the weeds, we have asked four questions when deciding whether a district court properly invoked this "strongest weapon": (1) Did the party act in bad faith? (2) Was the opposing party prejudiced? (3) Did the court give adequate warning? and (4) Could less drastic sanctions have ensured compliance?  *Grange Mut.*, 270 F. App'x at 376.

Assessed against these questions, the district court's default judgment was sound.

Question 1: In an area involving a sanction against an obstreperous actor, it should come as no surprise that "the first factor—bad faith—is the most important."  *Ndabishuriye v. Albert Schweitzer Soc'y, USA, Inc.*, 136 F. App'x 795, 800 (6th Cir. 2005) (per curiam).  The district court could find that Larson acted in bad faith for the same reasons that it could deny a continuance.  We won't belabor that evidence again.  Suffice it to say, she "repeatedly ignored court orders without excuse, and ultimately attempted to force the court to grant a continuance by refusing to proceed on the day of trial."  *Knoll v. Am. Tel. & Tel. Co.*, 176 F.3d 359, 364 (6th Cir. 1999).

In response, Larson argues that she did not act in bad faith because, given her injuries, she did "not have the ability to comply with the" trial date.  *See Beil v. Lakewood Eng'g & Mfg. Co.*, 15 F.3d 546, 552 (6th Cir. 1994).  Here again, the district court could discount her excuse both because she presented dubious documentation and because the excuse fell within a broader "pattern of delay."  Not only that, Rule 55(c) allowed Larson to move to set aside the default judgment on "mistake" grounds, Fed. R. Civ. P. 60(b)(1), so she could have later sought to assuage the district court's concerns with additional evidence.  But she did no such thing.  *See Schreiber v. Moe*, 320 F. App'x 312, 318 (6th Cir. 2008).

Question 2: As we have detailed, Larson's conduct prejudiced Prime Rate. Larson does not dispute the point, but counters that the district court could have imposed a fine to compensate Prime Rate. Yet, after the lengthy delay, Prime Rate was entitled to more than reimbursement. It was entitled to *its* day in court. And the district court could believe that a fine might not be effective against an individual who had already filed three bankruptcy petitions.

Question 3: The district court warned Larson that it was contemplating a default judgment. *Bass v. Jostens, Inc.*, 71 F.3d 237, 242 (6th Cir. 1995). Its August 6 order identified the court's powers under Rules 16 and 37, and said that "the failure of the defendants to abide by the Court's orders, submit required documentation, or appear in court as directed, will be met with the imposition of sanctions, including a default judgment in favor of the plaintiff."

Larson finds this warning inadequate because it did not suggest that the court still might grant a default judgment *even if* she responded with documentation. She is mistaken. For starters, a court need not give any warning where, as here, the sanctioned party acted in bad faith. *Mager v. Wis. Cent. Ltd.*, 924 F.3d 831, 840 (6th Cir. 2019). Regardless, Larson filed her response the day before trial and seven days after the court's August 6 order. She bore the risk that comes with such a midnight filing. (One aside: Larson does not challenge the district court's decision to *immediately* grant a default judgment, rather than wait the *seven days* contemplated by Rule 55(b)(2). We thus need not consider whether that waiting period applied here, but add that other courts have held that the period does not apply when a party fails to show up for trial. *See Turner v. Whitehorn*, No. 98-6635, 1999 WL 1336074, at *2 (6th Cir. Dec. 21, 1999) (citing cases).)

Question 4: The district court had imposed "less drastic sanctions in lieu of dismissing the case." *Bass*, 71 F.3d at 242. In April 2015, for example, it opted not to enter a default judgment for the Larsons' failure to appear; it instead ordered them to pay $2,000. It later excluded the Larsons' experts due to their failure to provide expert reports under Rule 26(a)(2)(B). Yet these softer sanctions failed to ensure continued compliance.

In sum, while courts reserve default judgments for "the most extreme cases," Larson's conduct during this litigation falls within that category. *United Coin Meter*, 705 F.2d at 845.

3. *Due Process*.   Larson lastly argues that the district court violated her due-process rights.  She is correct in thinking that the Constitution gives her the right not to be "deprived" of her "property" "without due process of law." U.S. Const. amend. V.  She is mistaken in thinking that the district court violated this proscription.

The Supreme Court's procedural-due-process cases (under the Fifth or Fourteenth Amendment) have not followed a uniform pattern.  Sometimes the Court has focused on notice. *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950).  Other times history has played the predominant role.  *Burnham v. Superior Ct. of Cal.*, 495 U.S. 604, 619 (1990) (plurality op.); *cf. Nelson v. Colorado*, 137 S. Ct. 1249, 1258 (2017) (Alito, J., concurring in judgment).   And still other times the Court has balanced various interests to identify the procedures that were due. *Nelson*, 137 S. Ct. at 1255.  No matter which framework the Supreme Court would choose to apply to Larson's due-process claim today, the claim comes up short.

At its most basic level, the Supreme Court has said, "due process" means "notice and opportunity for [a] hearing appropriate to the nature of the case." *Mullane*, 339 U.S. at 313. This notion follows from the longstanding meaning of the phrase.  In fact, the likely first time the phrase made its way into an English statute (in 1354), it was designed to ensure that defendants received notice of a suit and a chance to defend and avoid an ex parte judgment—procedures we might today call "service of process." *See Pacific Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 28 (1991) (Scalia., J., concurring in judgment); Frank H. Easterbrook, *Substance and Due Process*, 1982 Sup. Ct. Rev. 85, 95–96.  Under this view, if a court provides "adequate notice," it may "enter a default judgment against a defendant . . . who, without justifiable excuse, violates a procedural rule requiring the production of evidence." *Boddie v. Connecticut*, 401 U.S. 371, 378 (1971); *Davis v. Hutchins*, 321 F.3d 641, 645–46 (7th Cir. 2003).  If, by contrast, a defendant lacked notice, the default judgment cannot stand. *Peralta v. Heights Med. Ctr., Inc.*, 485 U.S. 80, 84–86 (1988).

The judgment in this case meets this notice mandate.  Prime Rate's service of process on Larson informed her of its suit, and the Federal Rules put all litigants on notice that the violation of certain court orders could trigger a default judgment. *See* Fed. R. Civ. P. 37(b)(2)(A)(vi). After a party receives notice of the *suit*, moreover, due process does not require a court to

provide notice and a hearing before every contemplated *order*, such as an order dismissing a suit for failure to appear at a conference.  *See Link v. Wabash R.R. Co.*, 370 U.S. 626, 632 (1962).  In all events, the district court's August 6 order gave Larson specific notice that a failure to appear could trigger a default judgment.  She had an opportunity to respond to that order, to defend herself at trial, and to file a post-judgment motion.  Her motion for a continuance came up short; she did not show up; and she failed to file a Rule 60(b) motion.  But she received all the process she was due (and then some) when viewing the due-process question through this lens.

The Supreme Court has not always relied on notice alone.  Sometimes it has been swayed by history (and Sir Edward Coke), asking whether a challenged procedure fell within "one of the continuing traditions of our legal system."  *Burnham*, 495 U.S. at 619 (plurality op.); *Tumey v. Ohio*, 273 U.S. 510, 523–32 (1927); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 276–280 (1856).  Default judgments pass this test too—at least when applied to a party's failure to appear, to produce evidence, or to follow similar procedural rules for litigating the case.  *Compare Hammond Packing Co. v. Arkansas*, 212 U.S. 322 (1909), *with Hovey v. Elliott*, 167 U.S. 409 (1897).  Such uses of a default judgment date to the founding: The Congress that drafted the Fifth Amendment also enacted the Judiciary Act of 1789, which allowed courts to "give judgment against [a defendant] by default" for failure to produce evidence.  1 Stat. 73, 82 § 15.  And "in the early practice of the common law, when [a] defendant failed to appear on the day on which the cause was to be tried, it was deemed a confession of the action."  10A Wright & Miller, *supra*, § 2681, at 8; *Thomson v. Wooster*, 114 U.S. 104, 110–12 (1885).  This history proved decisive in *Hammond*, which rejected a due-process challenge to a traditional use of a default judgment as a response to a party's failure to produce evidence.  212 U.S. at 349–53.  It proved equally decisive in *Hovey*, which accepted a due-process challenge to an unprecedented use of a default judgment as the punishment for a party who had refused to turn over contested funds.  167 U.S. at 413–44; *Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 705–06 (1982).

Here, the judgment against Larson—for her failure to appear and provide trial documents—falls within the "settled usages" of a default judgment.  *Murray's Lessee*, 59 U.S. at 277; *see Hammond*, 212 U.S. at 351.  That ends the matter under the historical approach to the

due-process question:  Under that view, the Due Process Clause does not give courts license to overturn a settled practice by mandating greater procedural protections that they might think "fairer."  Such departures from traditional procedure are instead reserved for legislatures (or rules drafters) in our federalist republic.  *See Burnham*, 495 U.S. at 627 (plurality op.).

The Supreme Court's due-process cases in the default-judgment context have focused on notice and tradition, *Peralta*, 485 U.S. at 84–86; *Hammond*, 212 U.S. at 351, so we think that these factors suffice to rebut Larson's due-process challenge.  Yet we need not definitively resolve that issue today because Larson's claim would still fail even under the third way the Supreme Court has approached due-process questions—the modern-day balancing of interests from *Mathews v. Eldridge*, 424 U.S. 319 (1976).  To determine whether federal or state procedures comport with due process, *Mathews*'s balancing approach "evaluates (A) the private interest affected; (B) the risk of erroneous deprivation of that interest through the procedures used; and (C) the governmental interest at stake."  *Nelson*, 137 S. Ct. at 1255.

The legal principles we have applied under *Rule 37* to evaluate a default judgment stand up quite well against these *constitutional* factors.  We, for example, have reserved such a sanction for the unusual case, *United Coin Meter*, 705 F.2d at 845, involving willful conduct, *Bass*, 71 F.3d at 241, precisely because of the "private interest" affected by a default judgment, *Nelson*, 137 S. Ct. at 1255; *see Societe Internationale pour Participations Industrielles et Commerciales, S. A. v. Rogers*, 357 U.S. 197, 209–12 (1958).  Likewise, we have asked whether a district court has considered lesser sanctions, *Bass*, 71 F.3d at 242, in order to examine "the probable value of additional or alternative safeguards," *Connecticut v. Doehr*, 501 U.S. 1, 11 (1991).  And we have recognized that courts (and opposing litigants) have important countervailing interests at stake, including ensuring respect for the judicial process and the timely resolution of claims.  *See Nelson*, 137 S. Ct. at 1255.  In sum, whenever a decision to grant a default judgment properly applies the factors that our court has adopted under Rule 37, it will also satisfy any due-process concerns under this balancing approach.  *Cf. Ins. Corp. of Ireland*, 456 U.S. at 706.  And, for the reasons already noted, the default judgment in this case properly applied Rule 37.

Larson responds that the district court violated due process by depriving her of her "right to [her] day in court." *Blackston v. Rapelje*, 780 F.3d 340, 358 (6th Cir. 2015) (citation omitted). Contrary to her claim, "[d]ue process does not . . . require that the defendant in every civil case actually have a hearing on the merits." *Boddie*, 401 U.S. at 378. And it was Larson who, through her conduct during this case, deprived herself of her "day in court."

We affirm.