NOT RECOMMENDED FOR PUBLICATION
File Name: 22a0129n.06

No. 21-3433

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**
Mar 24, 2022
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| INTEGRATED DESIGN ENGINEERING AND ANALYSIS SERVICES, INC., | ) ) ) | |
| Plaintiff-Appellee, | ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF OHIO |
| v. | ) ) ) | |
| GIDDY HOLDINGS, INC. AND BRETT JACOBSON, | ) ) | |
| | ) | OPINION |
| Defendants-Appellants. | ) ) ) | |

Before: SUTTON, Chief Judge; MOORE and GILMAN, Circuit Judges.

**KAREN NELSON MOORE, Circuit Judge.** Giddy Holdings, Inc. ("Giddy") and Integrated Design Engineering and Analysis Services ("IDEAS") contracted for IDEAS to manufacture Giddy's product. After a pricing dispute, IDEAS, Giddy, and Giddy's CEO, Brett Jacobson, entered into a settlement agreement. IDEAS subsequently sued Giddy and Jacobson for breaching that agreement, and Giddy and Jacobson counterclaimed. The district court enforced part of the settlement agreement's stipulated-damages clause, and, for the remaining damages, the jury awarded IDEAS $85,600 in lost profits. On appeal, Giddy argues that IDEAS was improperly allowed to recover both liquidated damages and lost profits, that the district court erred in finding that the settlement agreement assigned the costs of Food and Drug Administration ("FDA") compliance to Giddy, and that the district court abused its discretion when it did not grant a mid-trial continuance. For the reasons that follow, we **AFFIRM**.

## I. BACKGROUND

Giddy sells a product known as a "Giddy Pack," which includes a device used to treat erectile dysfunction known as the "Eddie." R. 116 (Tr. at 83, 137–38) (Page ID #1291, 1345–46). Giddy contracted with IDEAS to produce the Giddy Pack, R. 59-2 (Settlement Agreement at 1) (Page ID #484), and IDEAS subcontracted with other companies to manufacture the component parts of the Giddy Pack. R. 116 (Tr. at 49) (Page ID #1257).

Giddy initially contracted to purchase 55,112 packs over the course of two production runs. R. 59-2 (Settlement Agreement at 1) (Page ID #484). After a pricing dispute between the parties, they entered into a settlement agreement, agreeing to a third production run. *Id.* IDEAS agreed to a discounted rate for the first two production runs "in exchange for the express understanding th[at] Giddy will proceed with and fully fund" the third production run. *Id.*

While Giddy was importing the devices from China, some issues with FDA compliance arose. At one point, the FDA seized a shipment for failure properly to register the devices. R. 117 (Tr. at 204) (Page ID #1412). Giddy ultimately paid both FDA registration fees and legal fees during the registration process. *Id.* at 203 (Page ID #1411). The parties dispute whether, pursuant to the settlement agreement, Giddy had agreed to bear the cost of FDA compliance.

After Giddy ultimately opted not to fund the third production run, IDEAS sued Giddy and its CEO, Brett Jacobson, in state court, alleging that Giddy breached the settlement agreement. R. 1-1 (Compl.) (Page ID #6–27). Giddy removed the suit to federal court, R. 1 (Not. of Removal) (Page ID #1–3), and filed an answer and counterclaim, R. 4 (Answer & Countercl.) (Page ID #35–46). Both parties then moved for summary judgment. R. 58 (Pl.'s Mot. for Summ. J.) (Page ID #384–402); R. 59 (Def.'s Mot. for Summ. J.) (Page ID #470–80). The district court granted both

motions in part, making the following findings that are relevant to this case: (1) Giddy and Jacobson were liable for breach of contract; and (2) the $40,000 liquidated-damages provision with respect to the first two production runs was enforceable, but the $120,000 liquidated-damages provision with respect to the third production run was unenforceable.[1] *Integrated Design Eng'g & Analysis Servs., Inc. v. Giddy Holdings, Inc.*, No. 5:20-cv-00563, 2021 WL 848949, at *3–4 (N.D. Ohio Mar. 5, 2021). After a two-day virtual jury trial, the jury awarded IDEAS an additional $85,600 in lost profits with respect to the third production run, in lieu of the unenforceable $120,000 liquidated-damages provision. R. 109-1 (Verdict) (Page ID #1115). Giddy and Jacobson timely appealed. R. 112 (Notice of Appeal) (Page ID #1120).

## II. ANALYSIS

### A. Recovery of Both Liquidated Damages and Lost Profits

The first issue raised on Giddy's appeal is whether the district court impermissibly allowed IDEAS to recover both liquidated damages and lost profits. We review this issue of law de novo. *Andrews v. Columbia Gas Transmission Corp.*, 544 F.3d 618, 624 (6th Cir. 2008).

The settlement agreement contained two closely related damages provisions: "In the event Giddy's business plan changes and it decides not to proceed with PR3, then Giddy will pay the balance of the first two Production Runs in the amount of $40,000 representing the non-discounted pricing plus liquidated damages in the amount of 3 times the $40,000 amount." R. 59-2

---

[1]The district court also held that IDEAS did not breach the settlement agreement and that both IDEAS and Brad Borne (IDEAS's president) were entitled to summary judgment on Giddy's and Jacobson's conversion counterclaim. *Integrated Design Eng'g & Analysis Servs., Inc. v. Giddy Holdings, Inc.*, No. 5:20-cv-00563, 2021 WL 848949, at *5–6 (N.D. Ohio Mar. 5, 2021).

(Settlement Agreement ¶ 3.3) (Page ID #485). Giddy argues that the district court should have permitted IDEAS to recover liquidated damages or lost profits but not both.

Under Ohio law, which the parties agree applies in this diversity-of-citizenship case, "[t]he effect of a clause for stipulated damages in a contract is to substitute the amount agreed upon as liquidated damages for the actual damages resulting from breach of the contract, and thereby prevent[] a controversy between the parties as to the amount of damages." *Boone Coleman Constr., Inc. v. Village of Piketon*, 50 N.E.3d 502, 508 (Ohio 2016) (quoting *Dave Gustafson & Co. v. South Dakota*, 156 N.W.2d 185, 187 (S.D. 1968)). When a party recovers an amount of damages stipulated in the contract, it typically may not recover other damages, such as lost profits. *Id.*; *see also Domestic Linen Supply & Laundry Co. v. Kenwood Dealer Grp., Inc.*, 672 N.E.2d 184, 190 (Ohio Ct. App. 1996).

The bar against receiving both actual and liquidated damages stems from the principle that parties may not receive duplicate damages. *See Mentor Lagoons, Inc. v. Laity*, No. 10-184, 1985 WL 9999, at *1 (Ohio Ct. App. May 24, 1985) ("To allow a party to recover liquidated damages, as stipulated in the contract, and to also prove and recover actual damages allows a double recovery since liquidated damages are a pre-determined amount of what the actual damages will be in case of a breach."). If, however, separate damage provisions compensate a party for separate losses, this principle does not apply. In such circumstances, a party "is not barred from seeking both actual and liquidated damages since the two are based upon separate losses." *Fuschino v. Smith*, No. 2000-CA-31, 2001 WL 9928, at *5 n.5 (Ohio Ct. App. Jan. 5. 2001).

The bar against awarding duplicate damages has no bearing on this case. The settlement agreement contains two damages provisions. Although they are closely related, they are distinct.[2]

The first, enforceable, damages provision was for "the balance of the first two Production Runs" and "represent[ed] the non-discounted pricing." R. 59-2 (Settlement Agreement ¶ 3.3) (Page ID #485). This $40,000 amount is the difference between the amount that Giddy would have paid for the first two production runs absent the additional volume discount and the amount that Giddy actually paid for these runs.

The second damages provision is "liquidated damages in the amount of 3 times the $40,000 amount." *Id.* On appeal, the parties do not dispute the district court's finding that this provision is unenforceable. Unlike the first $40,000 in damages, this clause compensated IDEAS for damages related to the third production run. The $85,600 jury award replaced this unenforceable liquidated-damages amount (of $120,000) and was wholly separate from the $40,000 amount stemming from the first two production runs.

In short, unlike the cases upon which Giddy relies, the two types of damages awarded in this case compensate IDEAS for separate losses. They do not constitute impermissibly duplicative recovery. The district court therefore did not err in awarding both sets of damages.

## B. Responsibility for FDA Compliance

The next issue is whether the district court properly found that the contract made Giddy solely responsible for the cost of FDA compliance. *See* R. 116 (Tr. at 67) (Page ID #1275). This is a question of law that we review de novo. *See Andrews*, 544 F.3d at 624.

---

[2]They are also severable. R. 59-2 (Settlement Agreement ¶ 8.4) (Page ID #487–88).

Under Ohio law, "[t]he purpose of contract construction is to discover and effectuate the intent of the parties," and "[t]he intent of the parties is presumed to reside in the language they chose to use in their agreement." *Graham v. Drydock Coal Co.*, 667 N.E.2d 949, 952 (Ohio 1996). "As a result, if the language of a contract is plain and unambiguous," the terms are "enforce[d] . . . as written." *Beverage Holdings, L.L.C. v. 5701 Lombardo, L.L.C.*, 150 N.E.3d 28, 31 (Ohio 2019). "When considering the language of a particular contractual provision, '[c]ommon words [. . .] will be given their ordinary meaning unless manifest absurdity results or unless some other meaning is clear from the face or overall contents of the agreement.'" *Id.* at 32 (quoting *Cincinnati Ins. Co. v. Anders*, 789 N.E.2d 1094, 1098 (Ohio 2003)).

The paragraph at issue provides:

> ***Indemnity.*** The parties acknowledge and agree that they are not partners nor involved in a joint venture. Giddy is solely responsible for compliance with all government regulations (including but not limited to customs, Food and Drug [A]dministration, Environmental Protection Agency, Banking regulations, Security and Exchange Commission) and regulatory and/or contractual duties owed to investors. Giddy agrees to defend and hold harmless Contract Manufacturer for any and all claims by any governmental agency, Bank or banking institution, investor or potential investor. Giddy acknowledges and agrees that this agreement survives the closing of this agreement and the release set forth above.

R. 59-2 (Settlement Agreement ¶ 8.13) (Page ID #489).

The second sentence of the provision controls our conclusion. It states that "Giddy is solely responsible for compliance with all government regulations[.]" *Id.* As the district court aptly found, "as a matter of contract interpretation, . . . the settlement agreement, 8.13, made Giddy solely responsible for compliance with all government regulations, including Food and Drug Administration regulations." R. 116 (Tr. at 67) (Page ID #1275).

Giddy's argument to the contrary focuses primarily on the third sentence of the paragraph, which states that "Giddy agrees to defend and hold harmless [IDEAS] for any and all claims by any government agency[.]" R. 59-2 (Settlement Agreement ¶ 8.13) (Page ID #489). This sentence, however, is not the relevant part of this paragraph.

The fact that the paragraph is titled "Indemnity" does not change the outcome. The settlement agreement also provides that "section headings . . . do not constitute a part of this Agreement and shall not be deemed to limit, characterize, or in any way affect any provision of this Agreement, and all provisions of this Agreement shall be enforced and construed as if no section heading had been used[.]" R. 59-2 (Settlement Agreement ¶ 8.10) (Page ID #488–89); *see also Jordan v. Marion Tech. Coll.*, No. 9-90-36, 1991 WL 217662, at *2 (Ohio Ct. App. Aug. 15, 1991) ("Section headings in a contract are not binding provisions.").

The district court therefore correctly found that Giddy had assumed the cost of FDA compliance.

## C. Denial of Continuance

Finally, Giddy argues that the district court erred by denying its request for a continuance. We review the district court's denial of a continuance under the abuse-of-discretion standard. *United States v. Humphrey*, 608 F.3d 955, 962–63 (6th Cir. 2010). A district court's discretion to deny a continuance is particularly robust in civil cases, and "[i]t is hard to imagine an area in which an appellate court should give a trial court more leeway than in scheduling civil trials and considering continuance motions." *Prime Rate Premium Fin. Corp. v. Larson*, 930 F.3d 759, 766 (6th Cir. 2019). When determining whether the district court abused its discretion, we "avoid 'mechanical tests'" and instead look at the totality of the circumstances. *Id.* (quoting *United States*

*v. 9.19 Acres of Land*, 416 F.2d 1244, 1245 (6th Cir. 1969)). We consider factors such as the timing of the request, the need for a continuance, and the prejudice that would result. *Id.* at 766–67.

In this case, Giddy's counsel, Stephen Bales, suffered a medical emergency on March 22, 2021, the date on which trial had initially been scheduled to start. R. 101 (Defs.' Counsel Update) (Page ID #1061). The district court granted the defense's oral motion to continue the trial and reset the trial date for April 5, 2021. Docket, Minute Entry, Mar. 22, 2021. The defense did not request any additional continuance before the trial.

At one point during the trial, Christopher Clark, Giddy's corporate counsel, who was present but was not admitted or representing Giddy in the case, interrupted counsel's question with "[a]n urgent request . . . for a sidebar." R. 116 (Tr. at 115) (Page ID #1323). The district court denied the request. *Id.* at 116 (Page ID #1324). Bales then requested a sidebar, which the court also denied, noting that it did not "see any particular issue right here." *Id.* Clark stated that Jacobson requested to represent himself in the case. *Id.* The court denied that request. *Id.* at 116–17 (Page ID #1324–25).

After Clark stated that he felt that Bales was suffering from dementia, Bales told the court that he felt unable to proceed. *Id.* at 117 (Page ID #1325). In a subsequent sidebar, Bales told the court, "I don't know that I can continue" because "I have been misstating names," and "I don't know what's wrong." *Id.* at 118 (Page ID #1326). The court responded: "I don't see it at all. . . . I think you've handled the examination fine." *Id.* at 119 (Page ID #1327). Although Bales stated that he felt that he was not adequately representing his clients, the district court denied the request for a continuance, noting "I don't detect any of that. I don't think—I think you've actually done

8

a good job, maybe a bit over tedious, but I think that of about 99 percent of attorneys." *Id.* The trial then resumed.

On appeal, Giddy argues that counsel's medical issues impacted his ability to proceed, but it does not identify any specific way in which counsel's performance was substandard. *See Prime Rate Premium*, 930 F.3d at 766–67. Such assertions, coupled with the fact that the continuance request came mid-trial, do not persuade us that the district court abused its discretion in denying the request for a continuance.

## III. CONCLUSION

For the foregoing reasons, we **AFFIRM**.